**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JANE DOE, <br><br> Plaintiff, <br><br> v. <br><br> NORTHEASTERN ILLINOIS UNIVERSITY, NATALIE POTTS, KATHERINE TIERNEY, TERRY MENA, CINDY GUERRA, and JOE PRZYBYLA, <br><br> Defendants. | Case No.: 1:24-CV-07216 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT AT LAW

Plaintiff, Jane Doe ("Plaintiff" or "Doe") by and through her attorneys, Fegan Scott LLC, and for her Complaint against Northeastern Illinois University, Natalie Potts, Katherine Tierney, Terry Mena, Cindy Guerra and Joe Przybyla (collectively referred to as "Defendants") (all allegations being made on information provided to counsel by Plaintiff), states as follows:

### I. NATURE OF THE ACTION

1. For more than 18 months, Plaintiff Jane Doe, a respected Professor at Northeastern Illinois University ("Northeastern" or "NEIU") for more than two decades, has been the victim of stalking, threats, harassment and sexual harassment by Amanda Vander Kelen ("Vander Kelen"), a graduate student at Northeastern – with a known history of stalking and harassing professors. Since December of 2022, Northeastern has been aware of the situation, but repeatedly failed to take action to stop the stalking, harassment, and sexual harassment of Plaintiff, resulting in substantial damages to Plaintiff.

2. Defendants were aware of Vander Kelen's behavior toward Plaintiff in December of 2022, knew that Vander Kelen had a history of stalking (she had previously stalked another professor at the University of Illinois), and were constantly informed of Vander Kelen's ongoing, and escalating harassment and stalking of Plaintiff. Despite their knowledge of Vander Kelen's

behavior, they failed step in to protect Plaintiff from Vander Kelen's escalating and terrifying behavior. Defendants failed to timely arrest Vander Kelen, failed to enforce various no-contact orders against Vander Kelen, failed to implement a formal safety plan for Plaintiff, failed to timely provide Plaintiff with victims advocate services, and failed to respond to many of Plaintiff's requests for supportive measures. Northeastern also misrepresented Vander Kelen's status as an active student at NEIU and failed to take remedial measures to prevent Vander Kelen from contacting Plaintiff through Northeastern's e-mail and phone systems. Instead, Defendants merely suggested that Plaintiff act as the go-between the NEIU Police Department (hereinafter "NEIU PD") and the City of Evanston Police Department (hereinafter "Evanston PD") to pursue charges against Vander Kelen.

3.      As of March 2024, Vander Kelen continued to contact Plaintiff through Northeastern Illinois University systems and remained a graduate student at the University. It was not until April 5, 2024, 17 months after Vander Kelen's stalking and sexual harassment of Plaintiff began, that Vander Kelen was expelled from NEIU. This was only after Plaintiff demanded Vander Kelen's expulsion upon learning she was still listed as an active student.

4.      As the result of Defendants' actions, and inactions, Plaintiff's career stalled, and she suffered pecuniary losses. She was denied a previously promised promotion to History Department Chair because the stalking incident may hinder her performance. She also became the subject of rumors and inuendo when the Vice President and Dean of Student Affairs circulated an email from Vander Kelen alleging that Plaintiff had improper sexual relations with her students – knowing the information to be false. Because of Defendants' failures to provide Plaintiff with a safe working environment free from harassment by Vander Kelen, Plaintiff's fear for her safety became so severe that she was forced to lecture remotely during the Spring of 2023 and was forced to take a sabbatical in the Fall of 2023.

5.      To this day, Plaintiff suffers anxiety, embarrassment, humiliation, fear, loss of enjoyment of life, damage to her reputation, and severe emotional distress because of Defendants' failures to protect her from the continued stalking, harassment, and sexual harassment of Vander Kelen. Plaintiff files this Complaint under a pseudonym because she fears retaliation from Vander Kelen, associates and family members, and the secondary trauma that may be caused by identifying her in this Complaint.

6.      Plaintiff brings this Complaint for violations of Title IX of the Educational

Amendments of 1972, 20 U.S.C § 1681, *et seq.* ("Title IX"), and NEIU's own Policies related to harassment of students **and faculty** which obligated Northeastern to protect Plaintiff from the unwanted stalking, harassment, and sexual harassment by students in general, and Vander Kelen, in particular. Plaintiff also brings Illinois common-law claims against Defendants for Negligence, Breach of Contract, Intentional Infliction of Emotional Distress, and Defamation *Per Se*.

## II.    THE PARTIES

7.      Plaintiff Jane Doe is, and was at all relevant times, an adult individual and resident of the State of Illinois. At all relevant times, Plaintiff was and is employed by Defendant Northeastern Illinois University as a Professor of History and Latina/o and Latin American Studies, Associate Chair of the History Department through the 2022-2023 academic year, and a Graduate Advisor for the History Department. Plaintiff files this Complaint under a pseudonym for fear of retaliation and the secondary trauma that disclosure of her name could cause.

8.      Defendant Northeastern Illinois University is, and was at all relevant times, a public university in Chicago, Illinois. At all relevant times, Defendant Northeastern Illinois University employed Plaintiff Jane Doe and the individual Defendants named below.

9.      On information and belief, Defendant Natalie Potts ("Potts") is, and was at all relevant times, an adult individual and resident of the State of Illinois. At all relevant times, Potts was employed by NEIU as Title IX Coordinator until on or about August 28, 2023. All actions of Potts alleged herein occurred in the course and scope of her employment with NEIU. She is sued in her individual capacity.

10.      On information and belief, Defendant Katherine Tierney ("Tierney") is, and was at all relevant times, an adult individual and resident of the State of Illinois. Tierney is, and was at all relevant times, employed by NEIU as Interim Title IX Coordinator beginning on or about September 15, 2023. All actions of Tierney alleged herein occurred in the course and scope of her employment with NEIU. She is sued in her individual capacity.

11.      On information and belief, Defendant Terry Mena ("Mena") is, and was at all relevant times, an adult individual and resident of the State of Illinois. Mena is, and was at all relevant times, employed by NEIU as Vice President and Dean of Students for Student Affairs. All actions of Mena alleged herein occurred in the course and scope of his employment with NEIU. He is sued in his individual capacity.

12.      On information and belief, Defendant Cindy Guerra ("Chief Guerra") is, and was

at all relevant times, an adult individual and resident of the State of Illinois. Chief Guerra was at all relevant times employed by NEIU as Interim Chief of Police until on or about May 5, 2023. All actions of Chief Guerra alleged herein occurred in the course and scope of her employment with NEIU. She is sued in her individual capacity.

13.     On information and belief, Defendant Joe Przybyla ("Chief Przybyla") is, and was at all relevant times, an adult individual and resident of the State of Illinois. Chief Przybyla is, and was at all relevant times, employed by NEIU as Chief of Police beginning on or about May 14, 2023. All actions of Chief Przybyla alleged herein occurred in the course and scope of his employment with NEIU. He is sued in his individual capacity.

14.     Non-defendant, Amanda Vander Kelen ("Vander Kelen") is, and was at all relevant times, an adult individual and resident of the State of Illinois. At all relevant times, Vander Kelen was a student at NEIU until she was expelled on April 5, 2024. Vander Kelen engaged in an ongoing and escalating pattern of stalking and harassment of Plaintiff beginning in August 2022 and continuing to this day, in violation of several no-contact orders. As a result of such misconduct, Vander Kelen remains in custody of Cook County, Illinois, and awaits her criminal trial scheduled for September 4, 2024.

### III.     JURISDICTION AND VENUE

15.     This action arises under Title IX of the Educational Amendments of 1972, 20 U.S.C § 1681, *et seq.*, Northeastern Illinois University Policies, and Illinois common law.

16.     This Court has jurisdiction of Plaintiff's federal claims by virtue of federal question jurisdiction pursuant to 28 U.S.C. § 1331 and the protection of civil rights pursuant to 28 U.S.C. § 1343.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims for negligence, breach of contract, intentional infliction of emotional distress, and defamation pursuant to 28 U.S.C. § 1367.

18.     Venue is proper under 28 U.S.C. § 1391 because all the events and/or omissions giving rise to Plaintiff's claims occurred in this judicial district and it is where NEIU is located.

### IV.     BACKGROUND FACTS

19.     Plaintiff has long been employed by NEIU's Department of History and Latina/o and Latin American Studies Program. She began as an Assistant Professor, Department of History and Latina/o and Latin American Studies Program, in August 2004 before transitioning to

Associate Professor, Department of History and Latina/o and Latin American Studies Program, in September 2010 and then to Professor, Department of History and Latina/o and Latin American Studies Program, in September 2019.

20.     On or about August 22, 2022, Vander Kelen enrolled in Plaintiff's graduate course at NEIU. Plaintiff was Vander Kelen's Graduate Advisor in the History Department.

21.     By virtue of being a NEIU student, Vander Kelen was given access to an "nmail" email account with NEIU and regularly attended Plaintiff's courses on NEIU's campus.

**a.  Vander Kelen's Initial Contacts with Plaintiff**

22. Between August 27, 2022, and December 10, 2022, Vander Kelen, using her NEIU nmail account, emailed Plaintiff at least **thirty-four** (34) times:

(a)  08.27.22: Vander Kelen emails Plaintiff asking Plaintiff to review her first assignment before turning it in and asking for feedback on her writing.

(b)  09.05.22: Vander Kelen emails Plaintiff about accessing book reviews for an upcoming course assignment.

(c)  09.06.22: Vander Kelen emails Plaintiff about submitting the wrong assignment and sending the updated assignment. Later that day, Vander Kelen emails Plaintiff asking for a reference for Vander Kelen's Mossadegh Scholarship application.

(d)  09.08.22: Vander Kelen emails Plaintiff about how to access the archives.

(e)  09.10.22: Vander Kelen emails Plaintiff expressing her views on the Cities of the Sky episode that Plaintiff posted for students in a course Vander Kelen was not enrolled in but was able to view in the course portal in her capacity as an NEIU tutor in the tutoring center.

(f)  09.11.22: Vander Kelen emails Plaintiff asking if she will go over her paper before class.

(g)  09.14.22: Vander Kelen follows up on her 09.11.22 email thanking Plaintiff for helping with Vander Kelen's paper.

(h)  09.15.22: Vander Kelen emails Plaintiff about a 'triggering' encounter she had with a man.

(i)  09.18.22: Vander Kelen emails Plaintiff asking about her progress on her book review assignments and requests to meet before class to go over the most recent assignment.

(j)  09.22.22: Vander Kelen emails Plaintiff asking about the assignments for Plaintiff's Spring graduate course.

(k)  09.23.22: Vander Kelen emails Plaintiff about her first corporate presentation and telling Plaintiff she thought the Cuban documentary that Plaintiff recommended to the graduate course students was good.

(l)  09.25.22: Vander Kelen emails Plaintiff expressing disapproval of another student in Plaintiff's graduate course who had criticized Plaintiff.

(m)  09.29.22: Vander Kelen emails Plaintiff saying she might not be in class due to lack of internet.

(n) 10.03.22: Vander Kelen emails Plaintiff asking about potential PhD focus areas and interests.

(o) 10.11.22: Vander Kelen emails Plaintiff notifying her that she registered for Plaintiff's Spring graduate course and inquiries about funding for the Spring.

(p) 10.19.22: Vander Kelen emails Plaintiff with PhD questions.

(q) 10.29.22: Vander Kelen emails Plaintiff asking for her thoughts on Vander Kelen's potential paper topic for her PhD.

(r) 11.09.22: Vander Kelen emails Plaintiff requesting that she look over Vander Kelen's assignment prior to submission.

(s) 11.15.22: After Vander Kelen leaves Plaintiff's class abruptly, leaving all her belongings behind (including her car keys, purse, phone, coat, and computer), Plaintiff emails her to check in. That same day, Vander Kelen responds saying she is home and doing okay.

(t) 11.16.22: Vander Kelen responds to her previous email on 11.15.22 and tells Plaintiff that she left class due to having a panic attack.

(u) 11.19.22: Vander Kelen sends Plaintiff her master's thesis as proof of "more of what I can produce."

(v) 11.22.22: Plaintiff emails Vander Kelen asking to meet about her course performance.

(w) 11.23.22: Vander Kelen emails Plaintiff thanking her for meeting with her.

(x) 11.28.22: Vander Kelen emails Plaintiff asking for help with applying to PhD programs.

(y) 11.29.22: Vander Kelen emails Plaintiff about not being in class because a student triggered her PTSD. Plaintiff inquires whether the student did something to Vander Kelen, who says no.

(z) 11.30.22: Vander Kelen emails Plaintiff about quitting her job to focus on school and asking for advice.

(aa) 12.02.22: Vander Kelen emails Plaintiff about her scheduled counseling session and thanks Plaintiff for being supportive.

(bb) 12.03.22: Vander Kelen emails Plaintiff about her ongoing struggle with eating disorders.

(cc) 12.04.22: Vander Kelen emails Plaintiff about registration for graduate courses and asking what Plaintiff's plans are for Winter Break.

(dd) 12.05.22: Vander Kelen emails Plaintiff confirming that she attended a counseling session through campus counselling services. Plaintiff had suggested Vander Kelen see someone through campus counselling services because she had missed several classes.

(ee) 12.06.22: Plaintiff emails Vander Kelen about considering disability accommodations given her frequent absences from class. Vander Kelen says she does not need such accommodations and that her absences will not be an issue.

(ff) 12.08.22: Vander Kelen emails Plaintiff that she won an award at work that will give her a trip to Mexico. Vander Kelen also mentions needing to find someone to take with her to Mexico.

(gg) 12.09.22: Vander Kelen emails Plaintiff congratulating her for being a finalist for NEIU's Distinguished Research Professor Award.

6

(hh) 12.10.22: Vander Kelen emails Plaintiff expressing her desire to discuss schoolwork once school resumes following Winter Break.

23.     Plaintiff responded professionally to coursework related emails and did not respond to emails with no relation to coursework and/or mentorship.

24.     On or about September 25, 2022, Plaintiff discovered that Vander Kelen had previously stalked a professor at the University of Illinois.

25.     On or about September 25, 2022, Plaintiff informed Charles Steinwedel (hereinafter "Steinwedel"), NEIU History Professor and Chair of NEIU's History Department, of Vander Kelen's stalking of the University of Illinois professor and the two agreed to watch for any escalating behavior.

26.     On or about November 16, 2022, the day after Vander Kelen left Plaintiff's class abruptly, Plaintiff contacted Mena via phone to discuss Vander Kelen's behavior. During this call, Plaintiff explained to Mena that Vander Kelen had a history of stalking, including a professor at another university. On or about December 12, 2022, Vander Kelen emailed Plaintiff saying "This may or may not seem out of the blue, and if nothing else I hope I don't offend you. But, I have very strong, very intense feelings for you. More than I am supposed to. I don't know if you would want to pursue something with me – something real. I have a lot of ideas, and I am sort of emotionally high maintenance. But, if you do… I'd love to get together sometime."

**b. NEIU Initial Response After Being Notified of Vander Kelen's Behavior Toward Plaintiff**

27.     On or about December 12, 2022. Plaintiff spoke with Steinwedel about Vander Kelen's inappropriate email.

28.     Steinwedel encouraged Plaintiff to contact NEIU's Title IX Coordinator, Defendant Potts, about Vander Kelen's behavior.

29.     Later that day, Plaintiff emailed Potts about Vander Kelen's escalating inappropriate behavior and forwarded Potts the December 12, 2022, email from Vander Kelen expressing her feelings for Plaintiff.

30.     On or about December 13, 2022, Potts responded to Plaintiff's email and outlined her internal options of a no-contact order and/or a Title IX Investigation. Potts also attached NEIU's Sexual Misconduct policy and recommended that Plaintiff download the Campus Shield phone application for safety purposes.

31.     That same day, Vander Kelen emailed Plaintiff asking her to go with Vander Kelen to Planned Parenthood to get Vander Kelen an abortion.

32.     On or about December 14, 2022, at 1:37 a.m., Vander Kelen followed up on her December 13, 2022, email to Plaintiff saying "I'm sorry. I'm not quite feeling well. I took some Motrin. A few. And I've had some wine. I was hoping you were around. I'm sorry to be bothering you so much."

33.     That same day, Potts drafted a no-contact order.

34.     That same day, Vander Kelen emailed Plaintiff for a second time asking her to take Vander Kelen to Planned Parenthood to get an abortion.

35.     On or about December 15, 2022, Potts emailed Vander Kelen the no-contact order.

36.     That same day, Potts notified Vander Kelen that she was "happy to get you an emergency appointment with Student Counseling if you want a safe and private space to discuss your concerns. You are our student and we want to be supportive while maintaining a safe environment for everyone." Potts never offered Plaintiff the supportive measure of counselling to discuss her harassment by Vander Kelen.

37.     That same day, Potts emailed Lt. David De Clet, Lt. Frank Covello, and Defendant Chief Guerra—all members of the NEIU PD—informing them of the no-contact order and that Plaintiff intended to file a police report regarding Vander Kelen's behavior.

38.     On or about December 16, 2022, Vander Kelen emailed Plaintiff saying she got a letter from NEIU's Title IX Office telling her that she cannot speak to Plaintiff. Vander Kelen also told Plaintiff that she intends to withdraw from NEIU so that they can communicate.

39.     Plaintiff forwarded the email to Potts, who let Plaintiff know that Mena would enforce the no-contact order against Vander Kelen.

40.     Later that day, Plaintiff filed a police report regarding Vander Kelen's behavior with both the NEIU PD and the Evanston PD.

### c. Vander Kelen's Behavior Escalates for Five Months Until She Is Placed in Custody by NEIU PD

41.     On or about December 17, 2022, Vander Kelen emailed Plaintiff asking Plaintiff to visit her. Plaintiff did not respond.

42.     On or about December 19, 2022, Vander Kelen emailed Plaintiff eight times. Plaintiff did not respond and forwarded all emails to Potts, Chief Guerra, and Steinwedel:

8

(a) Vander Kelen emails Plaintiff about the food she ate today.

(b) Vander Kelen emails Plaintiff saying she spoke with Mena, does not believe that Plaintiff filed the No-Contact Order, and believes that Potts is a liar.

(c) Vander Kelen emails Plaintiff saying she was raped.

(d) Vander Kelen emails Plaintiff asking that she make sure Vander Kelen is not arrested and explaining that her weight is dropping.

(e) Vander Kelen emails Plaintiff requesting to meet on campus tomorrow morning.

(f) Vander Kelen emails Plaintiff confessing her love for her and saying she wants to be her wife.

(g) Vander Kelen emails Plaintiff saying she spoke with NEIU PD who confirmed that Plaintiff did not do "this."

(h) Vander Kelen emails Plaintiff saying she will cc her personal email in all future contacts in case she loses access to her campus email account.

43. On or about December 20, 2022, Vander Kelen emailed Plaintiff saying, "they [NEIU] are watching the emails." Plaintiff did not respond.

44. On or about December 21, 2022, Vander Kelen emailed Plaintiff asking her to come get her. Plaintiff did not respond.

45. On or about December 22, 2022, Vander Kelen emailed Plaintiff saying she misses her. Plaintiff did not respond.

46. On or about December 29, 2022, another student in Plaintiff's graduate course with Vander Kelen emailed Plaintiff saying that Vander Kelen is trying to contact her. Plaintiff did not respond.

47. That same day, Vander Kelen emailed Plaintiff a YouTube video in which she claimed that Vander Kelen and Plaintiff had been married for thirty (30) years. Plaintiff did not respond.

48. Later that day, Plaintiff emailed Mena, Potts, Steinwedel, and Chief Guerra explaining that Vander Kelen's tactics had changed to calling Plaintiff's office phone repeatedly, sending YouTube videos, and using other NEIU students to relay messages, causing Plaintiff to fear for her safety.

49. From January 1, 2023, Vander Kelen continued to regularly contact Plaintiff until she was arrested on campus and placed in NEIU PD custody on May 4, 2023.

50. Plaintiff did not respond to Vander Kelen and forwarded all emails, voice mails, and anything of the like to Potts, Mena, Chief Guerra, and Steinwedel:

(a) 01.03.23: Vander Kelen emails Plaintiff she is no longer an NEIU student.

(b) 01.04.23: Vander Kelen calls Plaintiff's home landline.

(c) 01.05.23: Vander Kelen emails Plaintiff asking her to call and providing her phone number. Vander Kelen then calls Plaintiff's campus phone and leaves a voicemail reiterating that she is trying to get ahold of Plaintiff. Vander Kelen later emails Plaintiff saying, "Am I just your little whore now?"

(d) 01.07.23: Vander Kelen calls Plaintiff's campus phone and leaves a message to call her and saying she loves her.

(e) 01.09.23: Vander Kelen calls Plaintiff and leaves a message saying she was hoping to catch her.

(f) 01.10.23: Vander Kelen calls Plaintiff's campus phone saying that Plaintiff is recovering from breast reduction surgery and to come over. Vander Kelen calls again saying Plaintiff's phone charger is in her car and saying "love you. Bye"

(g) 01.12.23: Vander Kelen calls Plaintiff's campus phone three times and leaves messages saying she is being harassed

(h) 01.13.23: Vander Kelen calls Plaintiff's campus phone wishing Plaintiff happy Friday the 13th and mentioning that this is "going to be your [Plaintiff's] lucky day."

(i) 01.19.23: Vander Kelen calls Plaintiff's campus phone two times saying she loves her and is trying to reach her.

(j) 01.23.23: Vander Kelen calls Plaintiff's campus phone saying she misses her.

(k) 01.25.23: Vander Kelen calls Plaintiff's campus phone three times and asks where the f*** she is.

(l) 01.31.23: Vander Kelen calls Plaintiff's campus phone two times and says Plaintiff's work is bugging her and to have them leave her alone.

(m) 02.06.23: Vander Kelen calls Plaintiff's campus phone.

(n) 02.07.23: Vander Kelen emails numerous professors in NEIU's History Department asking for help because her school email has been disabled. Vander Kelen calls Plaintiff's campus phone talking gibberish and saying she loves her. Vander Kelen later emails Plaintiff a YouTube video of the professor from University of Illinois that Vander Kelen stalked.

(o) 02.25.23: Vander Kelen calls Plaintiff's campus phone four times and leaves messages about how she does not know what is going on and that Plaintiff needs to fix this.

(p) 02.27.23: Vander Kelen emails Plaintiff calling her an asshole and telling her to reinstate her NEIU email. Vander Kelen then calls Plaintiff's campus phone seven times.

(q) 03.02.23: Vander Kelen calls Plaintiff's campus phone five times. Vander Kelen leaves a message on Plaintiff's campus phone saying she responded to the court letter and lists the case number.

(r) 03.03.23: Vander Kelen emails Plaintiff calling her an asshole before saying her heart is Plaintiff's if Plaintiff wants it.

(s) 05.03.23: Plaintiff receives two calls on her campus phone from Vander Kelen. Vander Kelen leaves voicemails, asking (1) to fool around and (2) to meet on campus tomorrow to clear things up. Vander Kelen calls Plaintiff again, leaving a message saying she will shoot for tomorrow at noon to meet with Plaintiff on campus.

(t)  05.04.23: Vander Kelen is caught on campus, arrested, processed at NEIU PD, and placed in custody.

**d. NEIU Fails to Act Despite Being Continually Informed of Vander Kelen's Escalating Behavior**

51.  As alleged herein, throughout December 2022 and despite a no-contact order, Vander Kelen continually attempted to contact Plaintiff.

52.  Plaintiff did not respond to Vander Kelen and, instead, continued to forward Vander Kelen's emails and voicemail transcriptions to Potts, Chief Guerra, Mena, and Steinwedel.

53.  On or about December 18, 2022, Plaintiff emailed Potts and Steinwedel forwarding numerous emails received from Vander Kelen and explaining that Vander Kelen does not appear to understand the no-contact order.

54.  That same day, Potts responded by telling Plaintiff that she had forwarded the emails to NEIU PD and instructed Plaintiff to send the emails to Evanston PD also. Plaintiff was never told why she had to contact Evanston PD or act as the go-between for Evanston PD and NEIU PD. Potts also notified Plaintiff that NEIU would install thumb locks in the classrooms on campus that Plaintiff will teach in for the Spring semester. At no point did NEIU conduct a risk assessment or hire an outside consultant to navigate Vander Kelen and her history of stalking.

55.  On or about December 19, 2022, Steinwedel emailed his colleagues in the History Department about Vander Kelen's stalking of Plaintiff and encouraged them to get the Campus Shield phone application for their safety. Another NEIU History professor responded with his concerns about Vander Kelen and provided a link to Vander Kelen's previous stalking of a University of Illinois professor.

56.  That same day, Mena notified Vander Kelen of her interim suspension.

57.  On or about December 21, 2022, in response to Plaintiff continually forwarding Vander Kelen's emails, Potts and Mena apologized that the behavior was continuing and suggested blocking Vander Kelen's email.

58.  On or about December 22, 2022, Potts emailed Plaintiff asking if the emails from Vander Kelen had stopped and encouraging Plaintiff to obtain a court order of protection. Potts offered Plaintiff no information on how to obtain such a court order.

59.  Around this same time, Plaintiff contacted Potts about whether she should return to in person teaching in January 2023. In response, Potts said "Do you have a trust fund? Why don't

you dip into your trust fund and go somewhere warm."

60.    On or about December 29, 2022, Plaintiff emailed Mena, Potts, Steinwedel, and Chief Guerra explaining her fear for Vander Kelen and that she has been unable to file a restraining order because Evanston PD has not yet sent her an updated police report. Plaintiff also notified them that NEIU PD has her birth year wrongly printed on their report.

61.    Chief Guerra responded to Plaintiff's December 29, 2022, email, apologizing for the mistake, and telling Plaintiff that she did not need to wait for the police report to obtain a court order of protection. Chief Guerra offered misinformation on how to obtain such a court order, leading Plaintiff to go to the wrong courthouse, and provided no other guidance about the process.

62.    On or about December 30, 2022, Plaintiff successfully obtained a stalking no-contact order against Vander Kelen on her own behalf.

63.    On or about January 3, 2023, Vander Kelen emailed Steinwedel asking why she cannot speak to Plaintiff. Steinwedel was instructed by Potts not to respond.

64.    That same day, Plaintiff asked Steinwedel, Potts, Mena, and Chief Guerra whether Vander Kelen has been served with the no-contact order. Plaintiff also asked Chief Guerra why this was not being treated as a stalking case, sharing that she believed Vander Kelen was sitting in her car in the cul-de-sac where Plaintiff lives. Chief Guerra never provided Plaintiff with a clear answer.

65.    On or about January 5, 2023, Potts misinformed Plaintiff that Vander Kelen's NEIU account has been fully and permanently disabled.

66.    That same day, Chief Guerra emailed Plaintiff to confirm Plaintiff's knowledge of whether Vander Kelen went to the house of the University of Illinois professor that she was stalking.

67.    On or about January 7, 2023, in response to Plaintiff informing Steinwedel, Chief Guerra, Potts, and Mena of repeated calls from Vander Kelen to her campus phone, Mena and Chief Guerra suggested blocking Vander Kelen's number.

68.    On or about January 12, 2023, Plaintiff informed Potts, Steinwedel, Mena, and Guerra that Vander Kelen has not been served with the no-contact order because her address is out-of-date.

69.    On or about January 19, 2023, an extension of the no-contact order against Vander Kelen was issued, but Vander Kelen has still not been served with it. Plaintiff repeatedly asked

Chief Guerra why Vander Kelen had not yet been served but did not receive a clear answer.

70.     That same day, Potts emailed Plaintiff asking when she will be returning to in-person teaching. Potts provided Plaintiff with no support or guidance on the return to in-person teaching and the securing of Plaintiff's safety on campus.

71.     On or about February 7, 2023, Vander Kelen emailed NEIU's History Department explaining that her email has been disabled and asking for help restoring it.

72.     That same day, a meeting was held, without Plaintiff, to discuss how to get Plaintiff to return to in-person teaching. Plaintiff later emailed Potts, Steinwedel, and Chief Guerra expressing her concerns about returning to in-person teaching.

73.     On or about February 9, 2023, the second no-contact order against Vander Kelen expired.

74.     On or about February 10, 2023, Vander Kelen was served with a no-contact order by publication, which was obtained by Plaintiff.

75.     On or about February 14, 2023, Plaintiff emailed Potts, Mena, and Chief Guerra inquiring about the process of having Vander Kelen arrested after she called Plaintiff's home phone. Plaintiff also reiterated to Potts, Mena, and Chief Guerra that Vander Kelen had a history of stalking, including another university professor, and emphasized her fears for her safety.

76.     On or about February 27, 2023, Plaintiff emailed Potts, Mena, Chief Guerra, and Steinwedel about aggressive voice messages she received from Vander Kelen on her campus phone and reiterated her fears for her safety.

77.     Potts responded to Plaintiff's February 27, 2023, email by asking whether Plaintiff is considering remote work or whether her safety must be assured on NEIU campus.

78.     On or about March 1, 2023, Steinwedel emailed the Dean of NEIU, Katrina Bell-Jordan, a letter detailing Plaintiff's harassment by Vander Kelen.

79.     That same day, due to Plaintiff's initiative, Plaintiff met with Potts, Mena, Chief Guerra, and Steinwedel. During this meeting, Chief Guerra lied by saying that NEIU had offered to drive Plaintiff to downtown Chicago to file the no contact order and reiterated that NEIU would not provide police protection if Plaintiff returned to in-person teaching. She offered to have a police officer escort Plaintiff to class but emphasized that the officer would not stay near the classroom. Plaintiff asked whether a risk assessment of the situation was going to occur, and Chief Guerra said that she had spoken to some of her "friends in Chicago PD." Plaintiff also specifically asked

what NEIU was going to do to ensure her safety on campus i.e., a safety plan, but received no clear answer. A few minutes into the meeting, Potts walked out and blamed Plaintiff for her decision to do so.

80.     On or about March 2, 2023, Plaintiff forwarded the transcription of a voicemail from Vander Kelen to Chief Guerra and Steinwedel.

81.     Chief Guerra responded to Plaintiff's March 2, 2023, email, saying that she does not know why Vander Kelen is still contacting Plaintiff.

82.     On or about March 3, 2023, Chief Guerra notified Plaintiff that NEIU is unable to prevent Vander Kelen's emails from going to Plaintiff's work email inbox but can flag the emails as spam. Chief Guerra also emphasized that any voicemails from Vander Kelen should be kept as evidence.

83.     On or about March 7, 2023, Chief Guerra informed Plaintiff that NEIU PD would attempt to arrest Vander Kelen on March 10, 2023.

84.     On or about March 9, 2023, Steinwedel sent a memo outlining Plaintiff's harassment by Vander Kelen to Marshall Thompson, NEIU's Contract Administrator.

85.     On or about March 13, 2023, Chief Guerra emailed Plaintiff notifying her that NEIU PD was unable to make contact with Vander Kelen on March 10, 2023, to make an arrest.

86.     On or about March 21, 2023, Plaintiff first met with a therapist to discuss the events contained herein.

87.     On or about March 28, 2023, Plaintiff met with her therapist again to discuss the events contained herein.

88.     On or about April 6, 2023, NEIU Union Representative, Rachel Birmingham, emailed Chief Guerra asking for the safety plan NEIU had in place for Plaintiff.

89.     That same day, Chief Guerra responded, outlining potential strategies to keep Plaintiff safe. As detailed herein, Plaintiff had previously requested a safety plan on several occasions, but no safety plan was put in place.

90.     That same day, a permanent order of protection was put in place.

91.     On or about April 10, 2023, Stephen Yokich, the lawyer for the union at NEIU, sent a letter to General Counsel at NEIU about Plaintiff's stalking and the shortcomings of NEIU with respect to the same.

92.     On or about April 12, 2023, Plaintiff met with her therapist again to discuss the

events contained herein.

93.    On or about April 18, 2023, Plaintiff met with her therapist again to discuss the events contained herein.

94.    On or about April 24, 2023, in response to Plaintiff's request via phone for information relating to her case, Chief Guerra emailed Plaintiff notifying her that Vander Kelen was arrested for an unrelated incident and was served with the stalking/no-contact order. Chief Guerra noted that Vander Kelen had since been released from custody.

95.    On or about May 3, 2023, in response to Plaintiff notifying Chief Guerra and Steinwedel about continued voicemails from Vander Kelen, Chief Guerra told Plaintiff that Vander Kelen is in violation of the no-contact order and will be arrested if she comes to campus.

96.    On or about May 3, 2023, Plaintiff notified Chief Guerra that Vander Kelen would be on the NEIU campus.

97.    On or about May 4, 2023, Vander Kelen was arrested on NEIU's campus, and placed in custody by NEIU PD for processing.

98.    On or about May 5, 2023, Vander Kelen was placed in custody by Cook County. Later that day, Vander Kelen was released on bond.

99.    That same day, in response to Plaintiff reiterating her continued fear for Vander Kelen, Rachel Birmingham responded asking Chief Guerra for the Union and NEIU to meet to come up with a formal plan to keep Plaintiff safe, i.e., a safety plan.

100.    On or about May 8, 2023, six weeks after walking out of the meeting with Plaintiff, Potts emailed Plaintiff apologizing for doing so.

101.    On or about May 9, 2023, approximately six months after NEIU was notified of Vander Kelen's behavior, Potts connected Plaintiff with Kris Krafka and Jennifer Green, LifeSpan victims' advocates. Kris Krafka had previously trained Potts on the importance of promptly connecting individuals with victims' advocates.

102.    On or about May 10, 2023, Plaintiff and Rachel Birmingham requested to meet with NEIU Administration, including Dean Bell-Jordan and Shayne Cofer, Vice President for Academic Affairs, to discuss the importance of taking the behavior of Vander Kelen seriously. During this meeting, Plaintiff also discussed her concerns with acting as the go-between NEIU PD and Evanston PD and her desire for certain safety measures, e.g., having a Ring camera installed at her house to ensure her safety during remote work.

103. On or about May 11, 2023, Rachel Birmingham emailed NEIU and Union staff, including Potts, Steinwedel, and Mena with strategies to keep Plaintiff safe when she returns to campus.

104. On or about May 12, 2023, Potts emailed Plaintiff about NEIU providing Plaintiff with a Ring camera for her house while working remotely, per Plaintiff and the Union's demand.

105. On or about May 16, 2023, Plaintiff met with her therapist to discuss the events contained herein.

106. On or about May 19, 2023, Plaintiff emailed Steinwedel about her concerns regarding the process of choosing the new History Department Chair, Mateo Farzaneh. At this time, Plaintiff had been the Associate Chair of the History Department for six (6) years and the Department had voted for Plaintiff to take Steinwedel's place. Instead, Steinwedel told Plaintiff to "just let Mateo [Farzaneh] do it [assume the role of Chair]" in light of the possibility of Plaintiff being awarded sabbatical leave due to the stalking situation and given that it would be bad for the Department if Plaintiff were Chair and went on leave.

107. On or about May 29, 2023, Rachel Birmingham emailed Plaintiff about installing a Ring camera.

108. On or about June 8, 2023, Plaintiff emailed Potts notifying her that Evanston PD told Plaintiff that, to upgrade to felony charges against Vander Kelen, NEIU needed to oversee the process. Plaintiff again expressed concerns about acting as the go-between for the police departments and who had jurisdiction over the case.

109. On or about June 14, 2023, Plaintiff emailed Rachel Birmingham and new NEIU PD Police Chief, Defendant Chief Przybyla requesting a police officer escort her to class.

110. Rachel Birmingham responded to Plaintiff's June 14, 2023, email by inquiring as to why stalking charges against Vander Kelen had not been raised earlier and requested a safety plan for Plaintiff in the Fall and assurance that Plaintiff can work remotely as needed.

111. On or about July 27, 2023, Plaintiff was awarded sabbatical leave for Fall 2023 as a result of the events contained herein.

112. On or about August 2, 2023, Steinwedel forwarded Plaintiff an email from Vander Kelen saying, "if [Plaintiff] stays on staff, I will make it a nightmare for the department." Steinwedel told Plaintiff "[T]his has gone on far longer than it should have. Much more should have been done sooner. I can't believe there is not some playbook for how to handle this, who is

responsible for what, etc."

113.    On or about August 3, 2023, Steinwedel emailed his colleagues in NEIU's History Department that Vander Kelen continued to stalk Plaintiff, and that he received four (4) emails from Vander Kellen calling for Plaintiff to resign or be fired or Vander Kelen will make it a "nightmare" for the department. Steinwedel subsequently notified NEIU PD and the Dean's office of Vander Kelen's emails and threats.

114.    That same day, Plaintiff emailed Chief Przybyla, Rachel Birmingham, Steinwedel, and Potts, along with several other union representatives, expressing concerns for her safety and that of her colleagues given the emails from Vander Kelen to Steinwedel. Plaintiff also asked why the charges have not been escalated against Vander Kelen and who has jurisdiction over the case.

115.    That same day, Chief Przybyla responded explaining that he tried to get a warrant for Vander Kelen's arrest but was turned away from the local courthouse, so he went to the courthouse in West Side Chicago.

116.    On or about August 14, 2023, Steinwedel circulated an email he received from Vander Kelen saying "[Jane Doe] better not be teaching for you any more. She fucker [sic] her students" to Chief Przybyla, Mena, and members of NEIU's History Department, noting that Vander Kelen's statement was "complete nonsense." This was the first time Plaintiff had seen this email from Vander Kelen, having not received it herself.

117.    That same day, Mena circulated an email to Chief Przybyla, Potts, and numerous other employees of NEIU that he received from Vander Kelen saying that "[Jane Doe] fucks her students." Mena added that "Several of us received this email from the former NEIU student. I just wanted to let you know that I am not planning to reply or respond to this email."

118.    On or about August 15, 2023, Vander Kelen called Plaintiff's campus phone and left a voicemail saying that Plaintiff should quit her job and come to get Vander Kelen. Plaintiff forwarded the voicemail transcription to victims' advocate, Kris Krafka.

119.    On or about August 16, 2023, Chief Przybyla, Plaintiff, and Kris Kafka met with the State's Attorney, who determined that there was not sufficient probable cause to proceed with felony charges against Vander Kelen because there was no surveillance. Plaintiff had previously asked Chief Guerra what was required to bring a stalking charge but was never informed of this.

120.    That same day, Vander Kelen, having fled to Florida, emailed Plaintiff saying, "does this mean we can all talk now."

121.    On or about August 25, 2023, Vander Kelen called Plaintiff's campus phone.

122.    On or about August 28, 2023, Claire Hawley (NEIU Interim Title IX Coordinator) emailed Plaintiff saying that she was up to speed on Plaintiff's case and that Chief Przybyla and Mena would continue to provide updates on the case.

123.    On or about September 15, 2023, Plaintiff emailed Mena, Steinwedel, Chief Przybyla, and several Union members informing them that Vander Kelen was jailed in Florida and asking for clarification from NEIU about who is dealing with the case. Mena responded by looping in the NEIU's new interim Title IX Coordinator, Defendant Tierney.

124.    On or about September 22, 2023, Tierney emailed Plaintiff with an update about Vander Kelen, explaining that she is banned from NEIU's campus and currently detained in Florida. Plaintiff was the one who had informed NEIU that Vander Kelen was jailed in Florida.

125.    On or about October 11, 2023, Chief Przybyla emailed Kris Krafka, Plaintiff, and Tierney to inform them that Vander Kelen pled guilty in Florida court and has been sentenced to time served in jail.

126.    On or about October 17, 2023, Vander Kelen was released from custody in Florida.

127.    On or about November 7, 2023, Plaintiff had an initial patient evaluation at North Shore University Health System—Department of Psychiatry and Behavioral Sciences.

128.    On or about November 9, 2023, Plaintiff was referred to a psychiatrist who specializes in high anxiety/stress. The psychiatrist told Plaintiff that she did not yet have PTSD since she was still going through the trauma related to the events contained herein. The psychiatrist referred Plaintiff to a list of providers; however, none were accepting new patients.

129.    On or about November 22, 2023, Chief Przybyla emailed Plaintiff informing her that Vander Kelen was arrested for an outstanding warrant in violation of the no-contact order and is in custody of the Cook County Sheriff and will be taken before a judge because she is unable to post bond.

130.    On or about December 19, 2023, Plaintiff emailed Joshua Hutton and Todd Sterling from the State Attorney's Office requesting to meet. Todd Sterling was the fifth or sixth State's Attorney who had been assigned to Plaintiff's case.

131.    On or about January 8, 2024, Plaintiff emailed the new chair of the History Department, Mateo Farzaneh, about the courses she would like to teach and updated him on Vander Kelen—she explained that the stalking is ongoing, and Vander Kelen is wearing an ankle

monitor.

132.    On or about January 18, 2024, Todd Sterling emailed Plaintiff about the proposed plea deal for Vander Kelen: twelve (12) months conditional discharge, mental health evaluation, and a two (2) year extension of order of protection.

133.    On or about January 25, 2024, Tierney reached out to check in on Plaintiff.

**e.    Vander Kelen Harassment of Plaintiff Escalates Further and NEIU Fails to Respond**

134.    On or about February 7, 2024, Vander Kelen called Plaintiff's campus phone.

135.    On or about February 15, 2024, Vander Kelen called Plaintiff's campus phone two (2) times and left a voicemail asking what is going on and asking Plaintiff to drop the case so that she and Plaintiff could be together.

136.    That same day, Plaintiff forwarded the voicemail transcription to Todd Sterling, Kris Krafka, and Chief Przybyla.

137.    On or about February 16, 2024, Vander Kelen called Plaintiff's campus phone and left a voicemail telling Plaintiff "Okay so stop telling on me and hurry up and fix this before June because this needs to be over and you need to take me home with you like yesterday. So hurry up."

138.    That same day, Plaintiff emailed Shayne Cofer and Dean Bell-Jordan asking to postpone a scheduled presentation, explaining that she was stressed as Vander Kelen continues to contact her. Cofer and Bell-Jordan apologized for the continuing situation and agreed to postpone the presentation, but did nothing more to address the continued stalking of Plaintiff

139.    Later that day, Kris Krafka informed Plaintiff that Vander Kelen did not take the plea deal.

140.    On or about February 22, 2024, Plaintiff emailed Institutional Research and Assessment at NEIU requesting that Vander Kelen be removed from the list of active students. In response, Plaintiff was told to contact NEIU's Office of the Registrar, which she did.

141.    On or about February 24, 2024, Vander Kelen messaged Plaintiff through Plaintiff's Psychology Today profile (a profile that Plaintiff used for her internship).

142.    That same day, Vander Kelen called Plaintiff's campus phone six times.

143.    On or about February 25, 2024, Vander Kelen called Plaintiff's campus phone 12 times. Plaintiff informed Todd Sterling, Kris Krafka, and Chief Przybyla of Vander Kelen's repeated attempts to contact her.

144.    On or about February 26, 2024, Vander Kelen called Plaintiff's campus phone and left two voicemails.

145.    That same day, Vander Kelen also emailed NEIU's Geography Department saying that she is allowed back on campus in April 2024 and asking about job openings. In response, Vander Kelen was told that all positions are full. Plaintiff informed NEIU's administration that Vander Kelen had contacted the Geography Department from jail.

146.    On or about February 27, 2024, Vander Kelen called Plaintiff's campus phone two times and left a voicemail asking Plaintiff to call her back.

147.    On or about March 1, 2024, Vander Kelen called Plaintiff's campus phone again and left a voicemail asking Plaintiff to call her back.

148.    On or about March 2, 2024, Vander Kelen called Plaintiff's campus phone nine times and left a voicemail asking Plaintiff to call her back and saying she misses Plaintiff.

149.    On or about March 3, 2024, Vander Kelen called Plaintiff's campus phone and left a voice message for Plaintiff.

150.    That same day, Plaintiff emailed Todd Sterling, Kris Krafka, and Chief Przybyla expressing concerns for her safety. Chief Przybyla responded saying that since Plaintiff is off campus and teaching remotely, this information should be passed on to Plaintiff's local Police Department.

151.    On or about March 4, 2024, Kris Krafka emailed Todd Sterling outlining Vander Kelen's 36 violations of the no-contact order over the past month.

152.    On or about March 5, 2024, Chief Przybyla emailed Plaintiff and Kris Krafka a revised report regarding Vander Kelen and explained that the State's Attorney wants Plaintiff to contact Felony Screening to determine whether a felony charge against Vander Kelen will be added.

153.    On or about March 6, 2024, Vander Kelen was remanded into custody in Cook County.

154.    That same day, Tierney emailed Plaintiff saying she got an update from Chief Przybyla that Vander Kelen's conduct toward Plaintiff has escalated and that she is back in jail. Tierney also asked Plaintiff if her need for supportive measures has changed as a result. Plaintiff was not surprised by this update on Vander Kelen as she and Kris Krafka had ensured Vander Kelen was placed back in jail by providing voicemail transcriptions and a list of all the times

Vander Kelen had attempted to contact Plaintiff.

155.    Plaintiff responded to Tierney's March 6, 2024, email by outlining her desired supportive measures; however, Tierney never responded.

156.    On or about March 18, 2024, almost one month after Plaintiff informed the Registrar's Office that Vander Kelen was still listed as an active student, Plaintiff was informed that the Registrar's Office was trying to figure out which office generates the graduate student lists so that Vander Kelen can be removed.

157.    That same day, the Registrar's Office notified Plaintiff that "all communications about Amanda Vander Kelen's case will have to come from the history chair's office and your future inquiries in this regard must be addressed to the chair, which would then be communicated to the administration."

158.    On or about March 23, 2024, Vander Kelen made an inmate contact request via email through Getting Out to faculty in NEIU's Geography Department.

159.    On or about April 1, 2024, Mena emailed Plaintiff saying that NEIU was working to have Vander Kelen's name removed from the enrollment report.

160.    On or about April 5, 2024, approximately 17 months after Vander Kelen began sexually harassing Plaintiff, Vander Kelen was expelled from NEIU.

161.    On or about April 10, 2024, Vander Kelen made a second inmate contact request via email through Getting Out to faculty in NEIU's Geography Department.

162.    On or about April 12, 2024, Vander Kelen made a third inmate contact request via email through Getting Out to faculty in NEIU's Geography Department.

163.    On or about April 16, 2024, Shayne Cofer emailed Plaintiff about having a meeting with Plaintiff and members of NEIU and the Union to provide a status update on Vander Kelen.

164.    That same day, Plaintiff emailed Todd Sterling to request that probation be added to Vander Kelen's deal and informed him that Vander Kelen now continually attempts to contact NEIU's Geography Department about getting a job there.

165.    On or about May 1, 2024, during the last week of classes, Plaintiff met with members of NEIU and the Union to discuss Vander Kelen and Plaintiff's safety. This was the only meeting that NEIU scheduled with Plaintiff during the 2023-2024 academic year.

166.    That same day, Mateo Farzaneh emailed Plaintiff requesting her schedule so that he could ensure campus security escorts her in and out of the building. He then emailed the

Registrar's Office asking that all of Plaintiff's class locations be removed and replaced as TBD. This was the first time during the 2023-2024 academic year that Farzaneh had suggested measures to protect Plaintiff's safety, all of which Plaintiff had suggested at the meeting earlier that day.

167.    On or about May 8, 2024, Mateo Farzaneh emailed Plaintiff inquiring whether she will return as associate chair for the 2024-2025 academic year. Plaintiff responded that she will not.

168.    On or about June 6, 2024, Plaintiff reached out to Tierney. Plaintiff never heard back.

169.    Plaintiff is set to meet with a new psychiatrist on August 23, 2024.

## V.    RESPONDEAT SUPERIOR

170.    As detailed herein, Plaintiff was the victim of unwelcome stalking, harassment, and sexual harassment by Vander Kelen that was not adequately addressed by Defendants Potts and Tierney in their role as NEIU's Title IX Coordinator, by Defendant Mena in his role as NEIU's Dean of Students, or by Defendants Chief Guerra and Chief Przybyla in their role as NEIU'S Chief of Police.

171.    In acting or failing to act to address the ongoing stalking, harassment, and sexual harassment of Plaintiff by Vander Kelen, Defendants Potts, Tierney, Mena, Chief Guerra, and Chief Przybyla were acting within the scope of their employment. That is, Defendants Potts, Tierney, Mena, Chief Guerra, and Chief Przybyla's actions and inactions occurred within time and space limits authorized by their employment with Defendant NEIU and were actuated, at least in part, by a purpose to serve Defendant NEIU.

172.    As such, Defendant NEIU is liable under the doctrine of *respondeat superior* for its employees' state law torts of negligence, breach of contract, intentional infliction of emotional distress, and defamation.

## VI.    CAUSES OF ACTION

### A.    COUNT I - VIOLATION OF TITLE IX
### 20 U.S.C. §§ 1681-1688
### (Against Defendant NEIU)

173.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained above as though fully set forth herein.

174.    Pursuant to 20 U.S.C. § 1682, Title IX is a federal statute designed to prevent sexual

discrimination and/or harassment in educational institutions receiving federal funding.

175.    Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688, applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination based on sex in a school's "educational program or activity," which includes all the school's operations. Title IX provides in pertinent part: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a).

176.    Northeastern Illinois University receives federal financial assistance and is subject to Title IX.

177.    Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

178.    Both the Department of Education (DOE) and the Department of Justice (DOJ) have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or its regulations. 34 C.F.R. § 106.8(b) (DOE); 28 C.F.R. § 54.135(b) (DOJ).

179.    By the acts and omissions described herein, Defendant NEIU discriminated against Plaintiff on the basis of sex and in violation of Title IX when it failed to take effective remedial action to stop known stalking, harassment, and sexual harassment of Plaintiff by Vander Kelen, and failed to timely implement available and reasonable safety measures to allow Plaintiff to participate on campus, all in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

180.    Northeastern Illinois University exercised substantial control over Vander Kelen, as a student, and substantial control over the context in which Vander Kelen's harassment of Plaintiff occurred, namely, Plaintiff and Vander Kelen's campus email accounts and Plaintiff's campus phone number.

181.    Despite being aware of Vander Kelen's behavior toward Plaintiff on or about December 12, 2022, and being constantly updated on Vander Kelen's ongoing, escalating harassment and stalking of Plaintiff, Vander Kelen was not placed in NEIU PD custody until May

23

4, 2023 (after Plaintiff informed NEIU that Vander Kelen would be on campus); no safety plan was considered for Plaintiff until April 6, 2023 (despite Plaintiff's repeated requests for one), when NEIU Union Representative, Rachel Birmingham, demanded one; no effective safety plan was ever implemented; Plaintiff was not connected with victims' advocates until May 9, 2023, six months after NEIU was informed of the harassment; when Defendant Potts left the position as NEIU's Title IX Coordinator, her replacement, Defendant Tierney, only contacted Plaintiff three times total and never responded when Plaintiff outlined her desired supportive measures; as of March 18, 2024, Vander Kelen was still listed as a graduate student at NEIU; and it was not until April 5, 2024, 15 months after Vander Kelen's sexual harassment of Plaintiff began, that Vander Kelen was finally expelled from the University after Plaintiff alerted Defendant Mena that Vander Kelen was still listed as an active student.

182.     Defendant NEIU's acts and omissions were clearly unreasonable in light of the fact that NEIU was aware of Vander Kelen's repeated attempts to contact and harass Plaintiff, including via Plaintiff's campus phone and email account, despite the issuance of several stalking and no-contact protective orders and that Vander Kelen was in custody, and the fact that Defendant NEIU knew that Vander Kelen had previously stalked at least one other professor in the past and had several other offenses, including trespassing in people's homes.

183.     As a result of Defendant NEIU's unlawful acts and/or omissions, Plaintiff has suffered lost income and has suffered, and continues to suffer, other economic loss, the precise amount of which will be proven at trial.

184.     As a further result of Defendant NEIU's unlawful acts, Plaintiff has suffered, and continues to suffer, great anxiety, embarrassment, humiliation, fear, loss of enjoyment of life, pain and suffering, and severe emotional distress, the precise amount of which will be proven at trial.

185.     Plaintiff is entitled to reasonable costs and attorney fees incurred in pursuing this action.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

  a.  Grant Plaintiff an award in excess of the jurisdictional minimums of this Court;

  b.  Grant Plaintiff appropriate injunctive relief, lost wages, liquidated damages, front pay, compensatory damages, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorneys' fees and expert witness fees; and

c.   All other and further relief as the Court deems just and proper.

## B.   COUNT II - NEGLIGENCE
### (Against Defendants NEIU, Potts, Tierney, Mena, Guerra, and Przybyla)

186.   Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in this complaint as though fully set forth herein.

187.   Defendant NEIU specifically recognizes that it "does not tolerate sexual harassment" and has instituted a specific Sexual Misconduct policy to "advance Northeastern's long-held position that sexual harassment violates the standards of our community and is unacceptable, and to provide sexual harassment proceedings which will include a prompt, fair, and impartial process from the initial investigation to the final result. This policy furthers Northeastern's commitment to providing locations that are safe and secure from sexual harassment." NEIU University Policy, G1.8, Sexual Misconduct.

188.   Under NEIU University Policy, G1.8, Sexual Misconduct, which "applies to all members of the University community: students; employees …", Defendants NEIU, Potts, Tierney, Mena, Guerra, and Przybyla owed Plaintiff a duty to protect Plaintiff from sex discrimination, including but not limited to sexual harassment by a student, and to maintain a safe working environment.

189.   As detailed herein, Defendants NEIU, Potts, Tierney, Mena, Guerra, and Przybyla were all on notice that Vander Kelen was harassing Plaintiff and that her harassment and stalking persisted, despite the existence of numerous no-contact orders and even when Vander Kelen was in custody. All individuals also knew that Vander Kelen had previously stalked a professor at the University of Illinois.

190.   As an initial matter on December 12, 2022, and as detailed herein, Plaintiff spoke to Steinwedel about Vander Kelen's inappropriate behavior and email confessing her feelings for Plaintiff. That same day, Plaintiff—at the recommendation of Steinwedel—emailed Defendant Potts about Vander Kelen. On December 15, 2022, Defendant Chief Guerra was informed of the No-Contact Order that Defendant Potts was drafting against Vander Kelen and that Plaintiff intended to file a police report. On November 16, 2022, and again on December 16, 2022, Defendant Mena was notified of Vander Kelen's behavior toward Plaintiff when he (1) learned from Plaintiff of Vander Kelen's history of stalking and (2) when he was assigned the responsibility of enforcing the no-contact order against Vander Kelen.

191.    On information and belief, when Defendant Chief Guerra and Defendant Potts left their respective roles as NEIU Police Chief and Title IX Coordinator, they shared information regarding Vander Kelen's behavior toward Plaintiff with their successors, Defendant Chief Przybyla and Defendant Katherine Tierney.

192.    Following this initial notice, and as detailed herein, Plaintiff subsequently forwarded Defendants Potts and Chief Guerra all harassing emails and voicemail transcriptions received from Vander Kelen and met with these individual Defendants to discuss Vander Kelen's behavior toward her. When Defendant Chief Przybyla and Defendant Tierney took over from Defendant Chief Guerra and Defendant Potts, Plaintiff subsequently updated them of Vander Kelen's conduct in the same manner.

193.    Defendants NEIU, Potts, Tierney, Mena, Guerra, and failed to take reasonable corrective action designed to stop the harassment as well as having failed to take reasonable security measures to ensure that Plaintiff could work in a secure and harassment-free environment.

194.    Defendant Potts was aware of Vander Kelen's stalking and harassment of Plaintiff on or about December 12, 2022. Despite such initial knowledge and the fact that Plaintiff kept Potts informed of Vander Kelen's escalating behavior and continued harassment, including the fact that Vander Kelen had previously harassed a professor from the University of Illinois, Potts failed to timely investigate or address the harassment or enforce the various No-Contact Orders against Vander Kelen. Instead, Potts enabled Vander Kelen's continued harassment of Plaintiff by merely encouraging Plaintiff to send the harassing emails from Vander Kelen to NEIU PD; suggesting Plaintiff block Vander Kelen's email and phone number; encouraging Plaintiff to obtain a court order of protection against Vander Kelen while providing misinformation about where to do so and no other information about the process; telling Plaintiff that Vander Kelen's NEIU account was fully and permanently disabled when this was false (thereby enabling continued harassment via email and phone); and asking Plaintiff when she would be returning to in-person teaching without offering any supportive measures. Even more concerningly, as the individual tasked with establishing a safety plan and supportive measures for Plaintiff, Potts did not address Plaintiff's requests for a safety plan and walked out of a meeting discussing Plaintiff's safety on campus and subsequently did not speak to Plaintiff for over six (6) weeks. Moreover, Potts took over six (6) months to put Plaintiff in contact with victims' advocates.

195.    Defendant Tierney became involved in addressing the stalking and harassment of

Plaintiff by Vander Kelen on or about September 22, 2023. Despite Tierney's role as Title IX coordinator and her mandate to establish a safety plan and implement supportive measures for Plaintiff, Tierney only contacted Plaintiff three times total: to inform Plaintiff that Vander Kelen was currently detained in Florida (despite the fact that Plaintiff was the one who informed Chief Przybyla of the arrest of Vander Kelen in Florida); to check in on Plaintiff; and to tell Plaintiff she was aware that Vander Kelen's conduct had escalated and asking if Plaintiff's need for supportive measures had changed as a result. When Plaintiff responded outlining the supportive measures she needed, Tierney never responded.

196.    Defendant Mena was aware of Vander Kelen's stalking and harassment of Plaintiff on or about November 16, 2022, when Plaintiff informed him of Vander Kelen's strange behavior and previous stalking of a University of Illinois professor. Further, on December 16, 2022, Mena was assigned by Potts as the individual responsible for enforcing the no-contact order against Vander Kelen. Despite such responsibility, Plaintiff continued to be harassed and stalked by Vander Kelen and continuously communicated the methods of such harassment to Mena—all in violation of the various no-contact orders. Rather than enforcing such orders, Mena merely suggested blocking Vander Kelen's number and notified Vander Kelen of her interim suspension without ensuring Vander Kelen did not have access to her student email—a primary form of harassment of Plaintiff. Moreover, despite such interim suspension and in light of Vander Kelen's continuing harassment, Mena did not know Vander Kelen's name was still on the graduate student enrollment report until informed by Plaintiff and he did not have Vander Kelen expelled until April 5, 2024.

197.    Defendant Chief Guerra was aware of Vander Kelen's stalking and harassment of Plaintiff on or about December 15, 2022. Despite such knowledge (including that Vander Kelen had previously stalked another professor), and being repeatedly informed of Vander Kelen's continued stalking and harassment of Plaintiff, Chief Guerra enabled Vander Kelen's harassment of Plaintiff by telling Plaintiff to obtain a court order of protection but offering misinformation on how to do so and no other guidance about the process; suggesting Plaintiff block Vander Kelen's number as a remedy to the harassment; telling Plaintiff she did not know why Vander Kelen was still contacting Plaintiff; doing nothing to prevent Plaintiff from receiving Vander Kelen's harassing emails; and failing to arrest Vander Kelen promptly.

198.    Defendant Chief Przybyla was first informed of Vander Kelen's extensive and

repetitive stalking and harassment of Plaintiff on or about June 14, 2023. Despite such knowledge, Chief Przybyla was unable to answer Plaintiff's concerns about why stalking charges had not been brought against Vander Kelen, particularly considering Vander Kelen's escalating behavior, or which police department had jurisdiction over the matter. Moreover, despite his knowledge of Vander Kelen's continued harassment of Plaintiff—using NEIU email and/or phone systems— Chief Przybyla told Plaintiff that since she was off campus teaching remotely, she should take all her concerns to her local police department. When Plaintiff emphasized that Vander Kelen had violated the no-nontact order 36 times in February 2024, Chief Przybyla informed NEIU Title IX Coordinator, Tierney, of Vander Kelen's escalating conduct but played no role in preventing the continued harassment of Plaintiff by Vander Kelen or ensuring a safe working environment for Plaintiff at NEIU.

199.    It was reasonably foreseeable that such failures to take reasonable corrective actions would escalate, or allow to continue, the harassing and intimidating behavior that Plaintiff experienced in light of Defendants NEIU, Potts, Tierney, Mena, Guerra, and Przybyla's awareness of Vander Kelen's long history of repeatedly contacting and harassing Plaintiff and her previous stalking of another university professor.

200.    Defendants NEIU, Potts, Tierney, Mena, Guerra, and Przybyla breached their duty to protect Plaintiff from sexual harassment, including by a NEIU student, and interfered with Plaintiff's legally protected interest in a secure and harassment-free working environment. Specifically, despite being on notice that Vander Kelen was harassing Plaintiff and that her harassment and stalking persisted despite various no-contact orders and being in custody, and contrary to NEIU University Policy, G1.8, Sexual Misconduct, the above individuals continued to "tolerate sexual harassment" of Plaintiff by failing to enforce the various no-contact orders against Vander Kelen or ensure her prompt expulsion or arrest. Such inaction further breached NEIU University Policy G1.8 by failing to provide Plaintiff with a safety plan to ensure "locations that are safe and secure from sexual harassment," causing Plaintiff to seek remote learning options and sabbatical leave as an attempt to ensure her safety from Vander Kelen.

201.    As a result of Defendants NEIU, Potts, Tierney, Mena, Guerra, and Przybyla's unlawful acts, Plaintiff has suffered lost income and has suffered, and continues to suffer, other economic loss, the precise amount of which will be proven at trial.

202.    As a further result of Defendants NEIU, Potts, Tierney, Mena, Guerra, and

Przybyla's unlawful acts, Plaintiff has suffered, and continues to suffer, great anxiety, embarrassment, humiliation, fear, loss of enjoyment of life, pain and suffering, and severe emotional distress, the precise amount of which will be proven at trial.

203.     Plaintiff is entitled to reasonable costs and attorney fees incurred in pursuing this action.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

a.   Grant Plaintiff an award in excess of the jurisdictional minimums of this Court;

b.   Grant Plaintiff appropriate injunctive relief, lost wages, liquidated damages, front pay, compensatory damages, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorneys' fees and expert witness fees; and

c.   All other and further relief as the Court deems just and proper.

### C.     COUNT III - BREACH OF CONTRACT
### (Against Defendant NEIU)

204.     Illinois courts have long viewed the relationship between an educational institution and a professor to be contractual in nature and, generally, a university's catalogues, bulletins, circulars and regulations become part of the contract. See Annot., 6 A.L.R. 3d 1018 § 7 (1975); *Koch v. Board of Trustees*, 39 Ill. App. 2d 51, 56-7 (1963) (finding university regulations are customarily held to be a part of the employment contract); *Gray v. Loyola Univ.*, 274 Ill. App. 3d 259, 210 Ill. Dec. 330, 652 N.E.2d 1306, 333 (1995) (finding faculty manual was "essential part of the contract").

205.     Plaintiff was offered a position at NEIU as Assistant Professor, Department of History and Latina/o and Latin American Studies Program, which she accepted on or about August 2004. Plaintiff remained in that role until she was offered a position at NEIU as Associate Professor, Department of History and Latina/o and Latin American Studies Program, which she accepted on or about September 2010. Plaintiff was in that role until she was offered a position at NEIU as Professor, Department of History and Latina/o and Latin American Studies Program, which she accepted on or about September 2019. Plaintiff has been serving in the role of Professor for the Department of History and Latino and Latin American Studies at NEIU since on or about September 2019.

206.     Defendant NEIU specifically recognizes that it "does not tolerate sexual

harassment" and has instituted a specific Sexual Misconduct policy to "advance Northeastern's long-held position that sexual harassment violates the standards of our community and is unacceptable, and to provide sexual harassment proceedings which will include a prompt, fair, and impartial process from the initial investigation to the final result. This policy furthers Northeastern's commitment to providing locations that are safe and secure from sexual harassment." NEIU University Policy, G1.8, Sexual Misconduct.

207.    Defendant NEIU defines stalking as a form of sexual misconduct, covered by NEIU University Policy, G1.8.

208.    Under NEIU University Policy, G1.8, Sexual Misconduct, which "applies to all members of the University community: students; employees …", Defendant NEIU and all Individual Defendants contractually agreed to protect Plaintiff from sex discrimination, including but not limited to sexual harassment by a student, and to maintain a safe working environment.

209.    Under NEIU University Policy, G1.8, Sexual Misconduct, Defendant NEIU further agreed that supportive measures "will be provided to a person [such as Plaintiff] alleging sexual harassment regardless of whether a Complaint was or will be filed." Moreover, "the Title IX Coordinator shall communicate with [Plaintiff] … to address evolving needs."

210.    As detailed herein, Defendant NEIU breached its contract with Plaintiff by acting arbitrarily and capriciously when it failed to take effective remedial action to stop known stalking and sexual harassment of Plaintiff by Vander Kelen and failed to timely implement available and reasonable safety measures to allow Plaintiff to participate on campus.

211.    Despite being aware of Vander Kelen's behavior toward Plaintiff on or about December 12, 2022, and being constantly updated on Vander Kelen's ongoing harassment and stalking of Plaintiff, Vander Kelen was not placed in NEIU PD custody until May 4, 2023 (when Plaintiff informed NEIU that Vander Kelen would be on campus); no safety plan was considered for Plaintiff (despite Plaintiff repeatedly asking for one) until April 6, 2023, when NEIU Union Representative, Rachel Birmingham, asked for one; Plaintiff was not connected with victims' advocates until May 9, 2023, six months after the sexual harassment began; when Defendant Potts left the position as NEIU's Title IX Coordinator, her replacement, Katherine Tierney, only contacted Plaintiff three times and never responded when Plaintiff outlined her desired supportive measures; as of March 18, 2024, Vander Kelen was still listed as a graduate student at NEIU; and it was not until April 5, 2024, 15 months after Vander Kelen's sexual harassment of Plaintiff began,

that Vander Kelen was finally expelled from the university.

212.     As a result of Defendant NEIU's unlawful acts, Plaintiff has suffered lost income and has suffered, and continues to suffer, other economic loss, the precise amount of which will be proven at trial.

213.     As a further result of Defendant NEIU's unlawful acts, Plaintiff has suffered, and continues to suffer, great anxiety, embarrassment, humiliation, fear, loss of enjoyment of life, pain and suffering, and severe emotional distress, the precise amount of which will be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

    a.  Grant Plaintiff an award in excess of the jurisdictional minimums of this Court,

    b.  Grant Plaintiff appropriate injunctive relief, lost wages, liquidated damages, front pay, compensatory damages, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorneys' fees and expert witness fees; and

    c.  All other and further relief as the Court deems just and proper.

**D.     COUNT I - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against Defendants NEIU, Potts, Tierney, and Mena)**

214.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in this complaint as though fully set forth herein.

215.     Defendants NEIU, Potts, Tierney, and Mena's conduct, detained herein, particularly with respect to the repeated failure to address the continued harassment of Plaintiff by Vander Kelen, despite knowledge of such harassment, was extreme and outrageous:

216.     Defendant Potts was acutely aware of the continued stalking and harassment of Plaintiff by Vander Kelen despite various no-contact orders and even being in custody. Despite such awareness, Potts's conduct was extreme and outrageous in that it repeatedly enabled the continued harassment of Plaintiff by Vander Kelen through telling Plaintiff that Vander Kelen's NEIU account was fully and permanently disabled when this was false (thereby ensuring Vander Kelen was able to continue harassing Plaintiff through campus phone and email) and declining to timely implement supportive measures or connect Plaintiff with a victims' advocate. To enhance the outrageousness of Potts' conduct was that, despite being the NEIU representative charged with implementing supportive measures and establishing a safety plan for Plaintiff, she dismissed Plaintiff's repeated requests for a safety plan and walked out early into the meeting discussing

Plaintiff's safety on campus, leaving Plaintiff without an individual to ensure her safety from Vander Kelen on NEIU's campus.

217.    Defendant Tierney was acutely aware of the continued stalking and harassment of Plaintiff by Vander Kelen despite various no-contact orders and even being in custody. Despite such awareness, and the fact that Tierney was solely responsible for implementing supportive measures and a safety plan for Plaintiff, Tierney's conduct was extreme and outrageous in that she repeatedly enabled Vander Kelen's continued harassment by only contacting Plaintiff three times total and declining to respond to Plaintiff when she outlined her desired supportive measures, thereby leaving Plaintiff without protection and unable to ensure a safe working environment to allow for Plaintiff's return to on-campus teaching.

218.    Defendant Mena was acutely aware of the continued stalking and harassment of Plaintiff by Vander Kelen despite various no-contact orders and even when Vander Kelen was in custody. As the individual responsible for enforcing the no-contact order against Vander Kelen, Mena's conduct was extreme and outrageous in that he repeatedly allowed Vander Kelen access to her school email during her interim suspension and did nothing to prevent Vander Kelen from using her personal email and Plaintiff's campus phone number to harass Plaintiff, and despite Vander Kelen's escalating harassment of Plaintiff over the course of eighteen (18) months, did not remove Vander Kelen's name from the graduate student enrollment report and did not have Vander Kelen expelled from NEIU until April 5, 2024.

219.    Defendants NEIU, Potts, Tierney, and Mena knew there was at least a high probability that this conduct would cause severe emotional distress to Plaintiff by subjecting her to continued harassment and stalking by Vander Kelen, particularly given that—as detailed herein—Plaintiff repeatedly expressed her fear and concerns regarding her safety because of Vander Kelen's continuing conduct.

220.    Defendants NEIU, Potts, Tierney, and Mena's conduct did, in fact, cause severe emotional distress to Plaintiff evident in the fact that—as alleged herein—Plaintiff did not feel comfortable returning to campus and elected to teach remotely, was unable to speak at NEIU events due to her concerns regarding Vander Kelen, has not returned as associate chair of NEIU's History Department, and has sought mental health care and taken a sabbatical. Moreover, Plaintiff was denied the opportunity to be Chair of the History Department due to her desire to take leave, despite being the Associate Chair for six (6) years and being selected by the Department as the

individual who would take Steinwedel's place.

221.    As a further result of Defendants NEIU, Potts, Tierney, and Mena's unlawful acts, Plaintiff has suffered, and continues to suffer, great anxiety, embarrassment, humiliation, fear, loss of enjoyment of life, pain and suffering, and severe emotional distress, the precise amount of which will be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

    a.  Grant Plaintiff an award in excess of the jurisdictional minimums of this Court,

    b.  Grant Plaintiff appropriate injunctive relief, lost wages, liquidated damages, front pay, compensatory damages, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorneys' fees and expert witness fees; and

    c.  All other and further relief as the Court deems just and proper.

### E.    COUNT V—DEFAMATION *PER SE*
### (Against Defendant Mena)

222.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in this complaint as though fully set forth herein.

223.    Under Illinois law, defamation *per se* is a statement that is obviously and apparently harmful on its face. *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). Defamation *per se* exists when the language "imputes an inability to perform or a want of integrity in the discharge of duties or office of employment. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 88 (1996).

224.    On August 14, 2023, Defendant Mena circulated an email that he received from Vander Kelen that contained the false statement that "[Jane Doe] fucks her students."

225.    Defendant Mena circulated this email to Plaintiff, Defendant Potts, Defendant Chief Przybyla, Charles Steinwedel, Francesca Morgan (NEIU History Professor in the College of Arts and Sciences), Mateo Farzaneh, Kate Hahn (Executive Director of Academic Support Services), Melinda Storie (NEIU Professor and Advisor for the College of Arts and Sciences), and Dennis Grammenos (NEIU Geography Professor in the College of Arts and Sciences.)

226.    Such a statement is obviously and apparently harmful on its face in that it imputes a lack of integrity in Plaintiff's discharge of her duties as an NEIU Professor.

227.    Such a statement is also clearly defamatory in that it tended to harm Plaintiff's professional reputation as a Professor at NEIU by lowering her status in the academic, teaching,

and/or university community's estimation and/or deterring professors and/or students from dealing or associating with Plaintiff.

228.    Mena circulated this via email to nine different individuals, including numerous NEIU Professors who are colleagues of Plaintiff.

229.    Mena knew that Vander Kelen's statement about Plaintiff was false, or acted in reckless disregard of its falsity.

230.    As a result of the false statement circulated by Mena, Plaintiff has suffered damage to her reputation, lost income and has suffered, and continues to suffer, other economic loss, the precise amount of which will be proven at trial.

231.    As a further result of the false statement circulated by Mena, Plaintiff has suffered, and continues to suffer, great anxiety, embarrassment, humiliation, fear, loss of enjoyment of life, pain and suffering, and severe emotional distress, the precise amount of which will be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

a.   Grant Plaintiff an award in excess of the jurisdictional minimums of this Court;

b.   Grant Plaintiff appropriate injunctive relief, lost wages, liquidated damages, front pay, compensatory damages, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorneys' fees and expert witness fees; and

c.   All other and further relief as the Court deems just and proper.

## VII.    JURY DEMAND

232.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Jane Doe hereby demands a trial by jury in the above-captioned action of all issues so triable by jury.

Dated: August 14, 2024

Respectfully submitted,

/s/ *Timothy A. Scott*
Timothy A. Scott
FEGAN SCOTT LLC
150 South Wacker Drive, 24th Floor
Chicago, IL 60606
Ph: 630.273.2625
tim@feganscott.com

Georgia J. Zacest
(*Pro Hac Vice* to be filed)
FEGAN SCOTT LLC
104 Shawnee Trail
Del Rio, TX 78840
Ph: (830) 212-4042
georgia@feganscott.com

*Attorneys for Plaintiff*